And we'll hear argument next in Surlock v. New York State Office of Persons, 17-400. This way. Good morning, your honors. May- Just a few seconds before you start, as I understand it, you've reserved three minutes for rebuttal, and then after your preliminary argument, we'll hear from Mr. Ringwood, then Ms. Gale, then Mr. Alweiss, then Ms. Buhler, and then Mr.- or Ms. Carroll? Mr. Carroll, Mr. Carroll. Is that right? One, two, three, four, five. You're fifth, Mr. Carroll. Okay. Good morning, your honors. May it please the court. Christopher Watkins of counsel with Sussman & Associates on behalf of the plaintiff appellants. While these defendant's appellees had the responsibility for the care and custody of Michael Surlock, he was subjected to grossly, grossly neglectful treatment and care, as well as at times abusive treatment and care. The defendant's appellees were aware of that and failed to act. That, it failed to act to effectively remediate the problems that he- Am I right, and by the way, I should preface this by saying I've seen the videos and understand the severity of the condition here, and very much appreciate it. It certainly shows you the gravity of the situation. But am I right that principally what you're looking for, what the parents here are looking for is one on one or one to one supervision? Yes. Okay. Within the totality of all of the circumstances. Of course, I understand that. And the defendants are saying that in their, in really the office itself is saying, in our professional judgment, we can come close to one, but that's not necessary. Is that the debate? That's the central debate, Your Honor. And so there are three claims at issue on the appeal, the substantive due process claim. If that's the central issue, then I don't understand what constitutional issues exist here. Well, under substantive due process, it was clearly established that Michael had an established right to reasonably safe conditions, and to eliminate physical, psychological, and emotional abuse. There's a very intense debate about how that is to be accomplished. I mean, whether it's, as you acknowledged in your opening comments, and if there's an intense debate about how it can be, is to be done, I don't understand how you can reasonably charge the state defendants with conscious, shocking, unquestionably unreasonable conduct. It just doesn't follow logically to me. So help me understand. Thank you. Sure. Well, I think you have to begin with the nature of Michael's disabilities and the challenges and vulnerabilities. The record is hard-earned. We know the nature of the issues. So he's at Favre Road for a little over five years, the residence that's at issue. Over that five-year period, the defendants make . . . I would say the district court relied on, and the defendants make the argument, that they did try measures that were not quite one-to-one, and that those measures were effective. And I would say there's questions of fact as to both of those propositions, Your Honor. First being that they did try this enhanced staffing. And if you look at the record, that supposedly went into effect in January of 2010, enhanced staffing. Because Michael, at that point, had been subject to self-injurious behavior, abuse by certain staff, and supposedly this was an attempt to address that, Your Honor. So, and that's what you're saying the debate is. But in fact, if you look at the record, there's an email from Ms. Elliott, the treatment team leader, a year and a half later, in August of 2011, saying we can't even meet minimal staffing, much less enhanced staffing for Michael. So that, and there's other evidence in the record, including the fact that the defendants said that, including the fact that it wasn't even part of his treatment plan until 2011. And even after that, Ms. O'Brien, there's an email from her questioning whether it's being implemented. So I think there's a question of fact about whether the measures that they say were effective or designed to be effective were even implemented. And then the question, there's certainly a question of fact about whether, to the extent they were implemented, they were effective. Over that course of period of time, the five plus years, he goes to the emergency room 23 times, according to- He's involved in self-injury. Absolutely. There's no dispute about that, that that's a major source of the problem and the recurring injuries. But as of January 2010, through the end of his period of favor road, December of 2012, he goes to the emergency room 15 times out of the 23. That doesn't show effectiveness of the measures that they say they implemented in their professional judgment that were designed to be effective. And our expert says the standard of care in that situation for somebody like Michael, let's look at it. There is such a thing as one-to-one supervision, correct? And if somebody needs that supervision, it would be Michael. How can you say that given the nature of his disability and the recurring daily physical injuries he's experiencing, and the acknowledged effectiveness of having somebody close by to him at all times, because he gives precursor warnings when he's- So I think the record addresses it, but I just want to be sure I understand exactly what does one-to-one supervision entail? One-to-one- 24-7, is it- Well, he's at- He's getting- 18 hours a day, what is it? Sorry. When he's at the vocational workshop, he's getting already one-to-one supervision. That's in the record. In fact, in times, he's getting two-to-one supervision. So we're talking about the times that he's at Fravor Road, which is during the week, it's supposed to be from, I think it's three o'clock on, through the evening. And yes, while he's there, certainly that would be the question. Also on the weekends, and if you look at the record, the record shows an increase in certain self-injuries, injuries, whatever the source, on weekends. So those are the times when our experts, and not just the parents, the parents are advocating, but then you have neutral advocates. The Commission on Quality Care saying, that's what this gentleman needs. You have the Medicare, Medicaid, I'm sorry, service administrator, who's not the parents, who has a professional judgment. She says, that's what Michael needs, and that's in 2009. They don't do that. They say, we exercise our professional judgment by implementing this enhanced staffing, which is almost as good. But first of all, the record shows it really wasn't implemented. The defendants were aware of that through their own correspondence, that it wasn't being effectively implemented, and it wasn't effective. As our expert points out, one of the components of the enhanced staffing was this 15 minute checks on Michael. Well, Michael's self-injurious behavior isn't, he's not going to correspond his behavior to 15 minute intervals. So it doesn't make sense. But to get to the core of the question, certainly this court has acknowledged, in Zeno and other cases, Reynolds versus Giuliani, that defendant can still be deliberately indifferent even when they take some action. If they know, or should know, or the jury could find that they knew, that the action that they took was not effective in remedying a constitutional violation. And therefore, they needed to take further steps. But that begs the question of when you say steps to address the constitutional violation, what's the constitutional violation? Sure, to keep him reasonably, within reason, safe from physical, emotional, and psychological harm. That's the liberty interest. The argument essentially is that they were unwilling to do what your experts insisted should be done. That seems to me not to get close to a substantial, I'm sorry, substantive due process violation. Well, I think when you look at it within the totality of the circumstances, and it's not simply to be there so that they can help intervene when he's about to engage in self-injurious behavior. It goes to the whole situation. You have overtaxed staff who have other residents that they have to deal with, and then they have Michael. Precisely. Without having the one-to-one supervision, then that burden falls to them. And you see the resentment, there's two cases of abuse in the record that occurred during that period of time that were captured on video that the parents had installed. So, the wrist splints, the failure to properly apply the wrist splints, the failure to properly give medication, which is obviously a serious issue. All of those issues could be addressed, at least in part, by having the one-to-one supervision, or at least to try it, Your Honor. Maybe, but would you concede that perhaps one of the most difficult, imaginable professional tasks would be to try to keep someone injury-free who's determined to injure himself or herself? I don't have to imagine it. Before law school, I worked with severely developing disabled adults. So, I understand the pressures and the daily difficulty for people who are usually not paid as well as they should be. I get that very much. And that's why I think the court needs to focus certainly on the administrative defendants here, who had the authority to take action. There's, so- Mr. Porter, what is the rule that you want this court to articulate so that facilities like the one in question will be further guided? Or will be guided and not engage in or commit a substantive due process violation? Your Honor, I think the rule exists. And that rule, I think, is that the defendant should not substantially deviate from professional judgment or be deliberately indifferent to the ineffectiveness of measures that are taken that do not keep an individual in their custody and care, non-punitive custody, reasonably safe from harm. Whether that harm is from the- Substantive due process rule, at least in this context. That is the substantive due process rule in this context. Yes, Your Honor. So, I can go to negligence. I think negligence essentially is if the court determines that either, I think the substantive due process claim subsumes the negligence claim. And the same evidence, to the extent that evidence- The substantive due process claim has to subsume the negligence claim. I agree. Substantive due process negligence plus? It is. It's either grossly negligent, reckless, deliberately indifferent, substantial deviation from professional standards, but yes, it's something above mere negligence. Brief question about qualified immunity. Certainly. And then you make some arguments in connection with that. But why are not all of these folks entitled to qualified immunity? Based on which prong, Your Honor? Based on the clearly established prong. Okay. Based on knowledge that this would, what they're doing is necessarily wrong. And cut out for a second, Ms. Graham and Ms. Finster. Sure. Well, I believe it was clearly established under Youngberg and other cases, including cases of this court. And the district court acknowledged it, that Michael did have, as he was in non-punitive state custody, did have a liberty interest in being kept reasonably safe and free from physical and psychological and emotional harm. And there's questions of fact here about one, whether the defendants took actions that did that. And two, whether they knew that their actions that they took, or failure to act, created an excessive risk of violating that standard. I think that's clearly established. As to the personal involvement, I think it can be difficult. It's a difficult case to try on paper. There are several defendants. There's five years of conduct. But we attempted as best we could to tie the individuals to the underlying violations. And certainly when you begin with- At least with respect to that prong, it's more difficult. I think it depends on the defendants. I don't think it's so difficult with the administrative defendants. I think the three of them all had acknowledged authority to take action that they did not take. All had awareness of continued problems, serious problems, with respect to Michael's care at Fravor Road throughout the time he was there. And there are questions of fact about whether they took effective action or substantially deviated. I think it becomes murkier when you get to the other defendants. You've reserved three minutes for rebuttal. Thank you. Mr. Ringwood. Please, the court. Mike Ringwood, I represent the administrative defendants in this case. That would be Delaney, Gleason, Donoso, and O'Brien. Just from a, what I would suspect might be somewhat of a helpful factual backdrop found in the record. None of these individuals work daily at the Fravor Road site where the care and treatment was being carried out. They are not in a position to just randomly fire people. They're not the persons who hire persons. They are there to implement the policies that pre-exist, which include updating behavior modification plans if and when necessary. Updating the restrictive use of device plans if and when necessary, updating the individual plans of protection. My worthy adversary seems to be merging the issue of one-on-one supervision with what are clearly separate and distinctive acts of alleged abuse. Let me drop back to where the district court was when the decision was made regarding the summary judgment motion. The lower court dismissed many of the claims and granted summary judgment to many of the defendants, but not all. The district court, going through a substantial record and writing comprehensively at 128 pages, noted very clearly that these dismissed defendants were incredibly responsive to the needs of Michael Surlock. I'll go to one-on-one supervision right now if I could, since it seemed to capture the attention of the court right from the get-go. Where do we begin? We begin- We understand, by the way, that there are separate issues, but the central issue seems to be the lack of one-on-one supervision and whatever flows from that and some of the things that flow from that are some of the other issues before us. And I will elaborate on that directly, Your Honor. We start with what brings us to this court, federal court. Has to be a constitutional violation, a violation of a constitutional right. What makes up violations of constitutional rights are directed at individual people, not at the organization as a whole. What did Mr. Gleason do or fail to do that constitutes deliberate indifference? Let's see, on the one-on-one supervision, which wasn't an issue when Mr. Surlock first came in to live at Fravor Road. It developed later based upon complaints and concerns by his mother and father. What did Mr. Gleason do? What did Mr. Denuso do? What did Ms. O'Brien do? They jumped right into it. Now, certainly in the record, there is some commentary by others involved in the picture of care regarding whether it should now be one-on-one supervision. Some emails, yes. But one of those persons said one-on-one or changed the dynamics in terms of how many people are in that house. This was looked into, and the record shows, very clearly looked into, very clearly discussed, and very carefully thought out when enhanced supervision was the method of addressing this issue. And that enhanced supervision included dropping down the census in the house. Two people were taken out, and another person put in. And the whole idea was to have more time to get to Mr. Surlock, Michael Surlock, if possible. because this is not anything that can be done perfectly, if he appears to or is engaged in self-injurious behavior. And although council says otherwise, that things got worse, not better, that's not what the record reflects. The record regarding emergency room injuries bespeaks to the vast majority of them happening off premises at Oswego Industries, where council says actually the supervision was one-on-one, if not two-to-one. So we go back to the house, and we find out, and the record reflects this, that the self-injurious behavior became less over time with the enhanced supervision. But we have to keep looking at this from the basis of not a state medical malpractice or negligent claim, abiding by professional standards of care is a state malpractice claim, it's not a constitutional claim. And look at it from the constitutional level. Were these judgments that were reasonable from a professional standpoint, as opposed to, and I believe the quote was from the Youngerberg case, or were they choices that were a sham or otherwise illegitimate? There's been nothing alleged here of a sham or an illegitimacy. We have the benefit of your argument, Mr. Ringwood. Thank you, Ms. Gale. Thank you. Good morning. Your Honors, my name is Catherine Gale, and I'm here representing a unique group of defendants. Three registered nurses who were not directly working with the patient, with the client, but were in fact working as nurses who were- Dickerson, Motika, Reynolds. And Denise Reynolds, correct, Your Honor. And these three nurses were charged with the duty of providing oversight to the direct care workers in terms of medication administration and medical issues. And I believe the record is clear, and certainly the decision of the court below speaks to the fact that any other issues originally alleged against my nurses have been abandoned. And the only issue before the lower court was the medication errors. And whether or not the nurses, who were not directly responsible for administering the medication, whether or not they took the actions required of a person supervising the direct care folks. And without reiterating the facts and the- Ms. Gale? Ably set forth in- Hold on, just hold on a second. Yes. It's not even that standard that you articulated, is it? I mean, a mere mistake doesn't rise to a constitutional problem, or- Exactly, Your Honor. A mere mistake, even if that mistake is repeated over time, does not rise to a constitutional level in and of itself. And I think here, the record is clear and rather unique. This patient was, this client was receiving at one time over 54 pills and two powders per day. Taking just the sheer number and variety of medications and supplements and the manner in which they were administered. And even using the numbers with which we disagree, even using the numbers set forth in plaintiff's briefs, 37 errors over a five year period is clearly de minimis. So even on that basis, it would not rise to the level. Other examples indicate errors being something as simple as changing a medicine from three times a day to two times a day, but the patient receiving the same dosage. The suggestion is that we should have been proactive rather than reactive. But using that standard would require a nurse literally to follow around the caregiver as he or she was distributing the medications. Rather, our nurses complied with standards of care and standards of practice, meeting on a weekly basis to review and update the staff on how to administer medications. And to check to see if the medication errors were, in fact, being made. And if so, that the people were appropriately retrained and recertified. Thank you. Mr. Alwise? Please, the court, I have the privilege of representing the supervisory defendants, Ms. Elliott, Ms. Alexander, Ms. LaBeef, Mr. Reed, and Mr. Perkins, if I could simply quote from the decision itself on page 82, in sum, the undisputed facts establish that the supervisory defendants went above and beyond to accommodate the Surlock's constant demands and did all that they could to provide Michael with the best care possible. And then again, later on, in terms of when discussing the qualified immunity- Of course, it doesn't have to be, so that's almost taking on too much. Best care possible, I think that your argument is that it doesn't have to be the very best care possible, it just needs to be within the parameters of professional judgment and so on. In fact, I agree, your honor. In fact, Judge D'Agostino said that they went above and beyond what would be normally expected in performing their duties. They're not policy makers, this whole discussion of one on one care would not be within their scope of responsibilities or privilege, it would not even be able to make those determinations. In fact, what they did was their very best to implement the care plans that were prescribed to them to implement. I did not hear counsel to actually even discuss the supervisory defendants in terms of what his theories were on this appeal. So I will rely on our papers. Thank you, your honor. Thank you. Ms. Ruler, am I pronouncing that correctly? Ruler? Ruler. Morning, may it please the court. My name is Sarah Rulin. I'm with the Satter Law Firm representing appellee, Diane Finster. I have very little to add to what my colleagues have already stated, other than that there is no genuine issue of material fact with regard to- What, with respect to your client, and I understand that Judge D'Agostino thought, it's terrible, but it's not conscience shocking. But what would you think is enough to be conscience shocking in terms of conduct? So I think that it's, in the county of Sacramento versus Lewis, it's stated there's no specific yardstick. And this court's decision in Smith versus Half Hollow Hills stated that a single slap may be a constitutional violation, or it may not be a constitutional violation. What I would like to do is refer the court to the Southern District of New York case decision, West versus Whitehead, which we discussed in our brief that involved a client very much like Michael Surlock, who was hit with hangers, threatened with a hairbrush, gagged with a bib. There was an indication that this conduct had happened over several months, if not years. We would submit that that is heart-stoppingly brutal behavior, and that the single 31-second video that is the basis for the allegations against Dianne Finster simply does not rise to that level of brutality. And in fact, most of the videos that are in the record that involved Dianne Finster show her being very gentle with Michael Surlock. She helps him get out of bed, she helps him get dressed. And all indications are that Dianne Finster was very kind with Michael Surlock, and that the single video, it just does not show the level of brutality that would shock the conscience in a constitutional sense. And I would also point- The oddity of this shock the conscience rationale is that it's a legal principle. And one of, I think, your adversaries' arguments is that the jury might disagree. Certainly, I don't think that a rational fact finder looking at that video is going to see conscious shocking behavior. I would also refer the court to another Southern District of New York decision that came out just this summer. DK versus Teams, that's at 260F Supplement 3334, Southern District of New York, July 5th, 2017. The reason I draw your attention to that, Your Honor, is because that decision involved people in an IRA who were non-verbal, who were profoundly disabled, who were punched in the face, who were shoved against walls, denied food, hosed down with cold water. Again- What was the result of that? The result was that the Southern District concluded that that was conscious shocking behavior sufficient, or that there was a genuine issue of fact as to whether that was conscious shocking behavior that would constitute a constitutional violation. And again, the conduct that is shown in the video of Dianne Finster simply does not rise to that level. And taken in context with the totality of the circumstances, I don't think that there's any argument that Dianne Finster violated Michael Surlock's constitutional rights. I would also just add quickly that Dianne Finster, we submit, is also entitled to qualified immunity. But you're not suggesting that the horrors depicted in decay are the floor of conscious shocking behavior, are you? No, sir, I don't think so. But I think that if you have- Could do less than that and still be conscious shocking, right? I think it's pretty clear from Smith v. Half Hollow Hills that a single slap could be conscious shocking. Take it in context, but the courts have been very clear that it's a totality of a circumstances decision, and when it's taken with the entire record, as relates to Dianne Finster, which is a very small portion of the record, we just don't have that level of brutality. Was there any evidence in the record of malice other than maybe what a jury could draw from the video? There's absolutely no record of malice. In fact, Dianne Finster in her deposition noted that she was- Explaining that incident. Explaining that incident and explaining just sort of her- She was asked whether, I believe, the other staff criticized her or gave her a hard time because of her conduct toward Michael, and she said that they did. They criticized her because they thought she was spoiling him.  Sorry, Your Honor. That would be in the record at JA15758-60, where she talks about that. Thank you very much. Thank you, Your Honors. Mr. Carroll. Thank you, Your Honor. As we all know, Michael Sherlock was a profoundly injured, autistic, retarded child in the care of the state that periodically has behaviors when his will is thwarted, in which he bangs his head on the floors and engages in self-injury. We've read the record. We've read the briefs. As we know, my client had the duty to prevent it, and my client was the person on site that had to do this, and Michael appeared to be starting up a behavior, may very well have been starting up a behavior, and she put his legs- He was on the armchair of the chair he was sitting in, and she put her legs across his to keep him from doing anything else, and ran her finger across the front of his face. And these are all techniques that were taught her by the state of New York for handling Michael when he was starting up a behavior. What you would do is put your legs on him, and then he couldn't bang his head on the floor or injure himself. You actually, in one circumstance, he said, do a bear hug on the guy and hold him down, if you have to. There are no pillows around. You can't get him to the other thing, and it's an important thing to do, because at the time, they had this safe chair, and they were taking the safe chair, and all the nurses had to team up to carry a 180-pound thrashing Michael to the safe chair. So if you could get him calmed down before you got him that far into one of these behaviors- So your argument is that her behavior or conduct does not shock the contemporary conscience? Legitimate medical treatment, Your Honor, to prevent Michael from injury. So I would say that that is not conscious shocking behavior. That's her duty. Thank you very much. Mr. Watkins. Thank you, Your Honor. Thank you, Your Honor. Just briefly respond to that. My understanding of Ms. Graham's incident is that she was identified by another staff member as having poked Michael in the face and said, I fucking hate you. You're so bad. I can't- She was transferred from the facility. She was, but I can't see how that could be possibly said to be a therapeutic intervention. It certainly is not. And, by the way, the person who reported it, who I believe was Ms. Maines, was then punished for supposedly reporting it too late, which, as our expert points out- Is there something in the record, Mr. Watkins? Sure. Harm from that incident, for example? And I understand, again, the severity of the disability here, but there's no indication of physical harm. No. And I take it that you are relying on some form of psychological harm, but is there something in the record? Well, there is in the record that he had, despite being nonverbal, he did have excellent language reception skills. So to say that he didn't understand what she was saying or the tenor of what she was saying, I think, certainly could be disputed. So I think there is psychological abuse. That was early on in his stay in Fravor Road and certainly set a very negative tone for him in terms of being away from his parents and caretakers for his first 25 years. So I would say, yes, there's some serious harm, given the nature of Michael's disability and how vulnerable he is. I think you do have to look at that, not for sympathy's sake, but for understanding. And he did engage in self-injurious behavior. Now, I don't know of anything in the record that says he immediately engaged in self-injurious behavior after Ms. Graham or Ms. Finster did what they did, but I think that it's reasonable to say that that type of treatment is not going to reduce the self-injurious behavior and, if anything, will increase it. I think there were a number of things that were said. I don't want to necessarily try to rebut them, but I would say many of them are disputed questions of fact in terms of the medication, that the record-keeping. Our experts who reviewed the record-keeping said it was far below the standard of care, the medication. What evidence of harm is there or what allegation of harm is there in connection with the medication errors, for example? Overdose of medications that were documented. What harm? Well, the harm being that he didn't receive, on certain occasions he didn't receive the medication he was supposed to receive, and on other occasions he received too much of it. That, I think, is an inherent harm. In and of itself is inherently a harm. Particularly given the nature of certain of the medications, including a powerful psychotropic medication, yes. I would say that that is an inherent harm, to receive too much of it or not to receive it when he was supposed to. I see my time is up. I would just emphasize that there are questions of fact on all of the claims. We didn't get to the ADA claim, which is really more of a legal question. I do think that it bears noting that, I don't want to repeat our briefs, but I believe that the ADA does not require that services be provided to non-disabled individuals for there to be a duty to accommodate the particular individuals. Even Henrietta seems to suggest the contrary, but we've got your argument. Thank you, Your Honor. Thank you very much. Thank you very much. Well argued on both sides. We'll reserve decision.